R. J. Caldwell Company, Inc., Respondent, v. Connecticut Mills Company, Appellant.

First Department, February 8, 1929.

*Ralph S. Harris* of counsel [*Harold L. Smith* and *Alanson W. Willcox* with him on the brief; *Hughes, Schurman & Dwight*, attorneys], for the appellant.

*Terence J. McManus* of counsel [*Hugo I. Epstein* with him on the brief; *McManus, Ernst & Ernst*, attorneys], for the respondent.

Proskauer, J. Prior to September 1, 1922, the plaintiff had acted as exclusive selling agent for the defendant and had procured a contract by which the Fisk Rubber Company was to purchase from the defendant a large amount of tire fabric. On this contract with the Fisk Rubber Company 2,000,000 pounds were to be manufactured and shipped during the year 1926, and 2,151,220 pounds during 1927. Prior to September 1, 1922, a dispute arose between the plaintiff and the defendant with respect to plaintiff's rights to

commissions in the event that it should sever its relationship with the defendant. This dispute was adjusted by the execution on September 1, 1922, of a new contract between the parties which defined their future rights and obligations. In December, 1925, after plaintiff had ceased to be defendant's exclusive selling agent, the Fisk Rubber Company, concededly without legal justification, arbitrarily declined to accept any further deliveries under the sales contract. After protracted negotiations, the defendant and the Fisk Rubber Company agreed on a settlement. The plaintiff has recovered judgment for commissions upon the purchase price of merchandise which the trial court has found would have had to be delivered to yield the defendant as profit the amount paid by way of settlement.

The question upon this appeal is whether under the terms of the agreement executed between the plaintiff and the defendant on September 1, 1922, plaintiff is entitled to these commissions. In so far as material that agreement provided that for its commissions the plaintiff was to receive two and one-half per cent commission " on the net amount of all invoices for goods shipped by the mill, and which are accepted by the customer, during the period of this agreement, and any renewals or extensions thereof, whether such shipments are made on account of existing orders or sales contracts or orders or sales contracts hereafter obtained by the agent." It further provided that after the expiration of the agreement the agent should receive one and one-fourth per cent " on the net amount of all invoices for goods thereafter shipped by the mill on account of sales contracts theretofore obtained for and accepted by the mill and then uncompleted." The agent's commissions upon general business were thus made, both during the continuance and after the severance of its relationship as agent, to depend strictly upon actual shipment of merchandise. There were, however, further provisions relating especially to the contracts with the Fisk Rubber Company and two other customers. It is recited: " Subject, however, to the provisions contained in the last paragraph (both subdivisions ' A ' and ' B ') of this ' Seventh ' paragraph of this agreement, the agent shall be entitled from and after the time when it ceases to be Selling Agent for the Mill, to receive monthly in cash, commissions of three and one-half percent ($3\frac{1}{2}\%$) on the net amount of all invoices for goods thereafter shipped by the Mill on account of the said now existing sales contracts accepted by the Mill with the Fisk Rubber Co."

The last paragraph referred to reads as follows: " Anything herein to the contrary notwithstanding, it is mutually agreed: (a) That so long as the agent is the exclusive selling agent of the

Mill, the agent is entitled to its said commission only upon and to the extent that the goods are actually shipped and accepted by the customers, and at no time shall the agent be entitled to its said commission except upon and to the extent of goods actually shipped to the customer, and any commissions allowed or paid to the agent on account of goods shipped but which are not accepted by the customer or for any reasons are returned to the Mill or otherwise disposed of shall be forthwith refunded by the agent to the Mill; and (b) That the Mill at all times has the right to modify, waive, rescind, terminate or cancel any and/or all sales contracts in whole or in part with customers as it may deem best for its interests without regard to the agent's commission and in any such case the agent agrees to and hereby does consent thereto, and in case any such sales contract, or any provision thereof, is modified or waived its commissions shall conform to such modifications or waiver and in case any such contract is rescinded, terminated or cancelled it shall not have or be entitled to any commissions or claims whatsoever with respect to the unshipped portion of such contract."

In the light of these provisions of the agreement between the parties, it becomes important to set forth exactly what the defendant did after the breach of the contract by the Fisk Rubber Company. On February 10, 1926, the defendant wrote the Fisk Rubber Company that unless it heard from it within ten days, it would "place the matter in the hands of our attorneys with instructions to sue you, not only for our lost profits, but for the other direct losses which your failure to perform the contract is causing and will cause us." Five days later it wrote: "As you know, we want to go on with the contract. I suggest that you send me, at once, your best proposition and I will give you an immediate reply. If we do not agree on something at once I shall have to act in accordance with my letter of the 10th." And on February eighteenth defendant wrote: "We are * * * instructing our attorneys to proceed to bring suit against you on Tuesday next unless in the meanwhile you change your mind and conclude to go on with the contract." The ten days referred to in the letter of February tenth expired and the negotiations between the parties thereafter related merely to an adjustment of the amount of the damage. The parties here stipulate that the defendant was anxious to continue performance of the contract with the Fisk Rubber Company and that it entered into no negotiations for settlement by way of damages until "it was useless for the defendant to try to persuade the Fisk Rubber Company to continue with said contract." Finally the defendant and the Fisk Rubber Company agreed to settle the defendant's claim for the sum of $570,500, less five per cent, and to indemnify the defendant against

any claim of the plaintiff for commissions. The agreement of settlement provided: " In consideration of the foregoing Connecticut Mills Company agrees that on receipt of the cash indemnity contract referred to in paragraph 1 it will rescind, terminate and cancel the Sales Contract of November 29, 1919, between the parties hereto, as subsequently amended, and will release the Fisk Rubber Company from all further liability under said contract and its amendments."

The indemnity agreement contained the recital: " And whereas Fisk and Connecticut have entered into an arrangement to rescind, terminate and cancel the Sales Contract." The parties stipulate that " The defendant concluded the above settlement with the Fisk Rubber Company in good faith and under the advice of counsel that it was not liable to plaintiff for commissions."

It is the claim of the defendant that so long as it did not refuse to perform the Fisk contract and in the absence of fraud, it had full liberty under its contract with the plaintiff to make any adjustment of its claim for damages against the customer without incurring liability to the plaintiff, and that the plaintiff's right to commissions in the absence of such fraud or default on the defendant's part could accrue only on the purchase price of goods actually shipped by the defendant.

It is not contended that the defendant was in default in its relations with the Fisk Rubber Company, nor can it be contended that it was guilty of any fraud in the making of the settlement. It entered into the rescission agreement reluctantly. It is criticised by the respondent because it had the foresight to exact from the Fisk Rubber Company an indemnity agreement against this plaintiff's claim. From this, however, it cannot be inferred, in the light of the concession, that it had any sinister purpose to defeat the plaintiff's claim by subterfuge or artifice. We are not concerned, therefore, with any claim of fraud, nor may we predicate a judgment upon any general considerations of what would constitute equitable or generous treatment to the plaintiff. This is an action at law upon a written contract, and that contract is the charter of the plaintiff's rights. It is quite beside the point for plaintiff to urge that inasmuch as the defendant has received the amount by which it would have profited by performance of the agreement, it should in good conscience pay the plaintiff what it would have had to pay him upon performance by the Fisk Rubber Company. Indeed, the premise that it has received the equivalent of its legal damages is effectively challenged by the appellant. Even if that challenge is unsuccessful, however, it was still perfectly competent

for these parties to contract that in no event should commissions be payable except upon the price of goods actually shipped.

Practical considerations frequently prompt a manufacturer to insist upon this stipulation. The record sufficiently discloses, what is generally known, that a great element of value in a large contract, like the one with the Fisk Rubber Company, is that it fills many of the looms of the manufacturer with work, absorbs a large part of the overhead, and thus enables it to operate the remainder of its plant more economically. On the assumption of performance, it could afford to engage to pay a commission which it might not be able to afford upon the assumption of the mere payment of legal damages for breach. This practical reason for the insertion of such clauses in commission contracts is recognized in *Daly* v. *Chapman Mfg. Co.* (246 Mass. 118, 123). There the defendant agreed to pay the plaintiff for securing a contract for the manufacture of certain adapters for the American Can Company, one-half cent on each adapter delivered thereunder. The American Can Company unjustifiably canceled its contract. The defendant there (as here) made claim upon its defaulting purchaser and as a result " received as much money on these particular contracts as if the contracts had been carried out and all the adapters delivered and paid for." The court held: " The word ' delivered ' must be construed in accordance with its usual and ordinary meaning. * * * The fact that all the adapters contracted for by the can company were not delivered was not due to any fault of the defendant. * * * The contention of the plaintiff that to hold he is not entitled to recover will work an injustice is not tenable. The ruling is manifestly in accordance with the proper construction of the contract which the parties saw fit to make."

In the course of its opinion the Massachusetts Supreme Judicial Court, which has wide experience with the affairs of manufacturing corporations, especially pointed out that though the defendant had received by way of damages as much money as if it had carried out the contracts, after the cancellation of the contracts, however, the defendant attempted to retain the nucleus of its organization and to secure business, without success, and operated at a loss in 1919 and 1920, and this loss was not returned to the defendant except so far as it was covered by the settlement. This conforms with what the evidence in this case discloses, that the receipt of legal damages for the breach of a manufacturing contract under circumstances such as here exist falls short of making the manufacturer whole. The most important item of difference between the estimate of damage made by the defendant and that made by the Fisk Rubber Company was substantially undisputed. It was shown that if the contract had

been fulfilled by the Fisk Rubber Company, the defendant would have saved the sum of $195,101.56 in the amount of overhead expense applicable to the production of the remainder of its plant. This item was not allowed in the settlement. Actual injustice would here result from resting a decision upon a general impression of what may on the surface appear to be equitable rather than upon the considered agreement of the parties themselves.

This case must turn, therefore, upon the interpretation of the contract of September 1, 1922, and the application of that interpretation to the actual arrangement made between the defendant and the Fisk Rubber Company. It is clear that unless some additional right is conferred upon the plaintiff by the provisions of subdivisions " A " and " B " of paragraph 7, it can recover commissions only upon the purchase price of goods shipped. The defendant's covenant as to general business is to pay him one and one-fourth per cent on the net amount of all invoices for goods thereafter shipped by the mill. The specific provision which governs the Fisk Rubber Company contract restricts the plaintiff's right with equal definiteness. When it ceases to be the selling agent for the mill, it is entitled to receive three and one-half per cent " on the net amount of all invoices for goods thereafter shipped." In my view subdivisions " A " and " B " of paragraph 7 are intended further to limit and restrict the plaintiff's right and not in any sense to enlarge it. Examined in the light of the circumstance that every right of the plaintiff to a commission described in the earlier sections of paragraph 7 is restricted to commissions on merchandise actually shipped, subdivision " A " is subdivided into two parts. The 1st clause of the sentence is limited by the phrase " so long as the agent is the exclusive selling agent of the Mill," and provides that during that period it is to be entitled to commissions " only upon and to the extent that the goods are actually shipped and accepted by the customers." The 2d clause of subdivision " A " relates itself directly to the provisions in the previous paragraph that when the agent " ceases to be selling agent for the Mill," it is to receive " $3\frac{1}{2}\%$ on the net amount of all invoices for goods thereafter shipped by the mill." It provides that " at no time shall the agent be entitled to its said commission except upon and to the extent of goods actually shipped to the customer." It goes further and provides that in the event that a commission is paid and the customer should return the goods, the agent shall refund the commission upon the purchase price of said goods. The effect of subdivision " A " ·is once more to emphasize the agreement of the parties that the commission attaches only to the purchase price of goods which have been shipped.

Subdivision " B " is of similar purport. It provides that the mill " has the right to modify, waive, rescind, terminate or cancel any and/or all sales contracts in whole or in part with customers as it may deem best for its interests without regard to the Agent's commission and in any such case the agent agrees to and hereby does consent thereto."

Its next sentence is the one upon which the respondent chiefly relies. It reads: " In case any such sales contract, or any provision thereof, is modified or waived its commissions shall conform to such modifications or waiver and in case any such contract is rescinded, terminated or cancelled it shall not have or be entitled to any commissions or claims whatsoever with respect to the unshipped portion of such contract." Thus, the 2d clause of this sentence confers upon the mill the right to rescind, terminate or cancel any sales contract and free itself of the obligation to pay commissions. The 1st clause gives the mill the right to modify sales contracts and conform the commissions to such modification, always subject to the final clause that " in case any such contract is rescinded, terminated or cancelled, [the agent] shall not have or be entitled to any commissions or claims whatsoever with respect to the unshipped portion of such contract."

The respondent contends that the final transaction between the defendant and the Fisk Rubber Company was not a rescission, termination or cancellation of the contract, but a modification thereof. That contention is untenable both in logic and by authority. Here, the Fisk Rubber Company broke its contract in essential respects and the defendant was entitled to cancel and rescind as a matter of law and sue for damages. The defendant substantially gave notice of its intention so to do. The Fisk Rubber Company recognized the validity of this position, admitted its liability for the damages and sought to compromise the amount thereof. The final agreement between the Fisk Rubber Company and the defendant provides that the defendant " will rescind, terminate and cancel the sales contract." No inference unfavorable to the defendant may be drawn from the fact that it specifically inserted in its agreement with the Fisk Rubber Company the very words which, under its contract with the plaintiff, would discharge it from liability for commissions. If the words were used with factual accuracy and describe the true transaction between the defendant and the Fisk Rubber Company, the defendant was well within its rights in using them. They do actually state exactly what happened. It is a distortion of the ordinary meaning of words to describe as a modification of a sales contract an agreement by which the purchaser admits liability for essential breach of that

contract and agrees to pay damages for the breach. Such an agreement is not within the usual connotation of the word "modification." That the parties to this contract did not intend to give any such unusual meaning to the word "modification" is additionally indicated by the fact that it is joined with the word "waiver" in the phrase "in case any such sales contract, or any provision thereof, is modified or waived," and that this phrase is used in contradistinction to rescission, termination or cancellation. The mill might rescind, terminate or cancel the contract, in which event there would be no more shipments upon which commissions could accrue; or it might modify or waive full performance, in which case there would be delayed payment or reduced purchase price of actual shipments and correspondingly delayed or reduced commissions. Modification of a contract implies that the contract is continued and is to be performed with changes. The sales contract here was in fact brought to an end; in place thereof was substituted an entirely new liability and agreement, namely, a liability for damages because the contract had been breached and an agreement to pay those damages in lieu of performance. The defendant was not to pay commission on damages or on a law suit, but only on the purchase price of goods which it had shipped. Nor is this legal situation at all affected by the circumstance that the seller may have been made whole by the payment of damages. (*Daly* v. *Chapman Mfg. Co.*, 246 Mass. 118.)

Other authorities sustain this interpretation. In *MacDowell-Peterman Co.* v. *Independent Packing Co.* (211 App. Div. 781) the agent's contract entitled him to the usual one per cent brokerage when goods are shipped. The customer had paid a large margin upon the purchased goods and had the seller store them for his account. The purchaser then went into bankrputcy and the seller resold the goods below the contract price. The court held that clearly by the letter of the plaintiff to the defendant the condition upon which the plaintiff's brokerage fees were to be paid was fixed, and without any ambiguity itself provided that the one per cent brokerage was to be paid when the goods were shipped.

In *Lougheed & Co., Ltd.,* v. *Suzuki* (216 App. Div. 487) the plaintiff's brokerage was to be five per cent on the amount of the charter payable "on monthly payment of hire." The charterer canceled the charter party because the defendant was unavoidably delayed in making the boat available for use. The plaintiff was denied his right to a commission.

In *Fuller* v. *Bradley Contracting Co.* (183 App. Div. 6; affd., 229 N. Y. 605) the plaintiff's commission was to be paid "in event of such contract being accepted and executed by us" and "only as

and when and in the same proportion as we receive payment from the purchaser; that is to say the commission is only to be paid out of the payments under the contract." It was held: "A broker may bind himself not to demand payment unless the contract is actually carried out. * * * Such agreements are lawful and proper and not unusual." And the court adds that under such a contract only the capricious refusal on the part of the seller to perform, or fraud and deceit practiced by the seller, may confer any right upon the agent.

In *Watson* v. *Muskegon Steamship Corp.* (208 App. Div. 158) the inference was permitted that the plaintiff's commission was conditioned upon performance by the purchaser of a contract for the sale of a steamship. The seller had, however, recovered liquidated damages for the buyer's default, and by reason of this circumstance the trial court directed a verdict for the broker. Overruling this contention, FINCH, J., said: "It is urged by plaintiff that the defendant, having proceeded to recover the liquidated damages provided by the contract, has secured the benefit contemplated by the contract procured by the broker, and hence the broker has earned his commission. * * * In so contending, however, the plaintiff ignores the fact that the very question at issue in the case at bar is whether the plaintiff has expressly contracted that he is only to be paid a commission in the event of a certain contingency."

It is clear from these authorities that the plaintiff cannot rest upon the proposition that it is entitled to recover merely because the defendant has secured a benefit equivalent to performance of the contract. Authority is equally clear that the payment of damages as upon a rescission and under an agreement cannot be described as a modification of a contract.

The distinction between modification and rescission is thus stated in *Blanchard* v. *Trim* (38 N. Y. 225): "Where the title of the vendee has not been perfected for any reason, where there has not been a perfect delivery, where fraud has occurred, or where the contract, in any respect, remains executory, the idea of a rescission is quite appropriate. Where the same contract, in its essentials, is altered in its details, we at once appreciate the proposition of a modification."

In *Kempner* v. *Simon* (119 Misc. 60) a deed provided that certain covenants and restrictions might under certain circumstances be altered or modified. The court said: "There was nullification and abandonment of the restrictions, but in no sense an alteration or modification. Alteration and modification are not synonymous with substitution."

And in *Yonkers Fur Dressing Co.* v. *Royal Ins. Co.* (247 N. Y. 435)

the court thus describes an agreement of settlement: "The old causes of action were terminated. A new liability was substituted therefor. The nature of the new cause of action we need not define. Enough to say that it superseded the old."

To the same effect are *Schwartzreich* v. *Bauman-Basch, Inc.* (231 N. Y. 196, 203) and *Hanson & Parker* v. *Wittenberg* (205 Mass. 319, 326).

If the defendant in this case, instead of coming to a settlement with the Fisk Rubber Company, had instituted suit and recovered damages, it surely could not be claimed that there had been a modification of the sales contract. The legal situation is not changed by the circumstance that, instead of resorting to suit, it saw fit to take a part of what it claimed it would have realized as the result of suit.

For these reasons the judgment and order appealed from should be reversed, with costs, and judgment directed for the defendant, with costs.

DOWLING, P. J., MERRELL, FINCH and McAVOY, JJ., concur.

Judgment and order reversed, with costs, and judgment directed to be entered in favor of defendant, with costs.